# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MIGUEL A. GONZALEZ,

          Plaintiff,

    v.

NANCY A. BERRYHILL,[1] in her official
capacity as Acting Commissioner of the Social
Security Administration,

          Defendant.

**CIVIL ACTION NO.**

**4:16-cv-40134-TSH**

## REPORT AND RECOMMENDATION

### February 2, 2018

Hennessy, M.J.

    By Order of Reference dated May 16, 2017, pursuant to 28 U.S.C. § 636(b)(1)(B),

District Judge Hillman referred this Social Security appeal to me for a Report and

Recommendation.  Docket #25.  Plaintiff Miguel Gonzalez has moved to reverse the decision of

Defendant, the Commissioner of the Social Security Administration ("the Commissioner"),

denying Gonzalez Supplemental Security Income ("SSI").  Docket #17.  In the alternative,

Gonzalez asks that the Court remand his application for SSI benefits to an Administrative Law

Judge (an "ALJ").  Id.  The Commissioner has cross-moved to affirm the Commissioner's denial

of Gonzalez's application.  Docket #22.

    Having considered the parties' submissions, for the reasons that follow, I

RECOMMEND that Plaintiff's Motion to Remand, Docket #17, be DENIED and that

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill, Acting Commissioner of the Social Security Administration as of January 23, 2017, is substituted for Carolyn W. Colvin in this action.

Defendant's Cross-Motion for Order Affirming the Decision of the Commissioner, Docket #22, be ALLOWED.

I.      BACKGROUND

A.      Procedural History

Gonzalez applied for SSI on March 29, 2013.  Tr. 153.[2]  He alleged disability due to severed fingers on his right hand caused by an industrial accident, carpal tunnel syndrome in his left hand, and right shoulder and elbow pain.  Tr. 332.  His application was denied initially and upon reconsideration.  Tr. 153, 162.  After hearings on August 6, 2014 and February 10, 2015, an ALJ issued a decision on June 26, 2015 finding that Gonzalez was not disabled.  Tr. 9-36, 58.

On August 1, 2016, the Appeals Council denied Gonzalez's request for review, making the ALJ's June 26, 2015 decision final and ripe for judicial review.  Tr. 1-4.  Having timely pursued and exhausted his administrative remedies before the Commissioner, Gonzalez filed the instant complaint with this Court on September 16, 2016.  Docket #1.  Gonzalez filed a motion for reversal or remand on December 29, 2016, Docket #17, together with an accompanying memorandum of law, Docket #18.  In response, the Commissioner filed a cross-motion to affirm, Docket #22, along with a memorandum of law, Docket #23.  Gonzalez has opposed the Commissioner's motion to affirm.  Docket #24.

B.      Personal History

Gonzalez was thirty-five years old when he applied for SSI.  See Tr. 153, 328.  He last worked in 2001 in carpentry, stopping after suffering an industrial accident.  Tr. 68-69.  He is a high school graduate.  Tr. 333.  Gonzalez lives with his wife and two young children.  See Tr. 75.  He has never had a driver's license and relies on family members for transportation.  Tr. 76.

[2] Citations to "Tr." refer to the administrative record assigned docket numbers 15-1 through 15-8.  Page numbers refer to Defendant's Bates stamps, not the page numbers assigned by the Court's ECF system.

C.      Medical History

On January 16, 2001, Gonzalez injured his right hand while operating a saw at work.  Tr. 68-69.  The saw amputated the third, fourth, and fifth fingers of his right hand and injured his right index finger.  Tr. 118.  Only Gonzalez's fourth and fifth fingers were surgically reattached, and the middle joint of his fourth finger was fused.  Tr. 69-70, 118.

On March 3, 2004, Gonzalez began treatment with his former primary care physician, Dr. Jesus Blanco, and complained of severe pain in his right arm, elbow, and fingers.  Tr. 125. Gonzalez reported having previously undergone four reconstructive surgeries on his right hand. Tr. 125.  This statement is the only indication in the record of treatment prior to 2004.

On September 27, 2004, Gonzalez presented at an emergency room with a fractured right fifth finger.  Tr. 121.  The hospital observed swelling in Gonzalez's right hand and noted evidence of previous trauma to that hand, including "amputation of the middle finger, fusion of the ring PIP and fracture of the index PIP middle phalanx."  See Tr. 118-21.  Gonzalez was placed in a short arm cast and prescribed Vicodin.  Tr. 118, 121.

The record indicates that Gonzalez visited Dr. Blanco two other times in 2004 and twice more in 2005.  Tr. 123-125.  During those appointments, Gonzalez complained of pain and numbness in his right hand.  Tr. 123-25.  In 2005, Dr. Blanco prescribed Percocet and referred Gonzalez to hand surgeon Dr. James Shenko.  Tr. 123.

On March 14, 2005, Gonzalez began treatment with Dr. Shenko.[3]  Tr. 391.  In 2007, Dr. Shenko diagnosed Gonzalez with right ulnar neuropathy and performed an ulnar nerve transposition surgery.  Tr. 484.  On December 4, 2007, Dr. Shenko wrote a letter to Dr. Blanco

---

[3] There are no medical records from Dr. Shenko in the record, as Dr. Shenko was unresponsive to subpoena.  The record does contain letters from Dr. Shenko dated December 4, 2007, Tr. 393, and October 6, 2010, Tr. 462.  Dr. Shenko's surgeries and diagnoses are mentioned in other doctors' notes in the record.  See Tr. 444, 449, 484.

detailing Gonzalez's condition following the transposition surgery.  Tr. 393.  Dr. Shenko stated that Gonzalez's "motor strength appears intact along with his sensation.  His hand is structurally the same with preserved function."  Tr. 393.  Dr. Shenko also noted that Gonzalez was still complaining of pain in his right hand and elbow, but Dr. Shenko noted that "it is unclear what the etiology of [Gonzalez's on]going pain is."  Tr. 393.  Dr. Shenko opined that Gonzalez may have sustained neurological damage as a result of his right hand injury or nerve impingement in his neck or shoulder; Dr. Shenko therefore recommended that Gonzalez seek treatment from a pain clinic.  Tr. 393.  Dr. Shenko also stated that he had "no plans for any further treatment o[f] this patient at this time."  Tr. 393.

In 2007, Gonzalez visited Dr. Michael Gotthelf for a neurological exam.  Tr. 465-67.  After performing a nerve conduction study and an EMG, Dr. Gotthelf diagnosed Gonzalez with "bilateral carpal tunnel syndrome, very mild, worse on the [r]ight."  Tr. 467.  He also conducted a physical exam and observed that Gonzalez's right fourth and fifth fingers "show grade 3/5 weakness of finger flexion, abduction, and adduction."  Tr. 465.

Available treatment notes indicate that Gonzalez visited Dr. Blanco a total of six times during 2007 and 2008.  Tr. 402-404.  During that time, Dr. Blanco continued prescribing Percocet for chronic pain management, and Gonzalez engaged in physical therapy twice per week.  Tr. 395, 402.  Dr. Blanco remained Gonzalez's primary care physician until 2008.  Tr. 387; see Tr. 380-81.

At Dr. Shenko's recommendation, on March 24, 2008, Gonzalez presented at the UMass Memorial Medical Center.  Tr. 394-95, 399.  He complained of moderate to severe pain in his right shoulder and reported taking Percocet.  Tr. 394.  He also reported having previously undergone "seven reconstructive surgeries in his right hand . . . ."  Tr. 394.  The clinic physician

4

noted that Gonzalez "seems to have . . . neuropathic pain affecting his right upper extremity," and he also observed that Gonzalez had "full range of motion of bilateral upper and lower extremities" and "4/5 motor strength [in the] right upper extremity." Tr. 394. The physician opined that Gonzalez was "a candidate for chronic opiate therapy" and expressed his belief that "a mistake was made" when Gonzalez discontinued opiate use. Tr. 394. However, the physician noted that "we do not prescribe opiates at our clinic" and recommended that Gonzalez seek opiate treatment elsewhere. Tr. 394, 399.

On October 15, 2008, Gonzalez began treatment with his current primary care physician, Dr. Thomas Weisman. See Tr. 380-81. He complained of right hand and elbow pain during that visit. Tr. 380.

Nearly two years later, on August 24, 2010, Gonzalez visited Dr. Gotthelf for a second neurological exam. Tr. 420-23. Dr. Gotthelf diagnosed Gonzalez with "Right Ulnar nerve entrapment at the Cubital Tunnel" and "Bilateral Carpal Tunnel Syndrome, mild." Tr. 423. He observed during a physical exam that Gonzalez had "Grade 4/5 weakness of abduction of the 2nd, 4th and 5th fingers" of the right hand but exhibited normal reflexes and sensation. Tr. 420.

On October 2, 2010, Dr. Shenko performed a second ulnar nerve transposition surgery. See Tr. 449. Dr. Shenko examined Gonzalez after this procedure and reported his evaluation to Dr. Weisman by letter dated October 6, 2010. Tr. 462. Dr. Shenko noted that Gonzalez continued to report numbness and pain in his right hand and arm that "radiates up to his elbow and up into his neck . . . ." Tr. 462. Dr. Shenko observed that while Gonzalez "has decreased ulnar strength in [his right] hand, and decreased sensation in the fourth and fifth digits," his right hand and wrist were "structurally stable" and "stable to stress loading." Tr. 462. Dr. Shenko concluded that Gonzalez "has chronic pain from his previous injuries, but now has an overlying

symptomatic nerve injury." Tr. 462.  Dr. Shenko opined that Gonzalez might need additional surgery.  Tr. 462.

The record indicates that Gonzalez visited Dr. Weisman six times in 2010 for routine checkups.  Tr.  459-61.  Gonzalez continued reporting pain in his right hand and elbow, and Dr. Weisman prescribed Percocet and gabapentin for pain management.  Tr. 459-61.  Gonzalez then visited Dr. Weisman four times in 2011, still complaining of pain in his right fingers and elbow as well as an injury to his knee from a fall.  Tr. 455-59.  In August 2011, Dr. Weisman noted "no change in [Gonzalez's] chronic right upper extremity pain" but observed that "Percocet helps him tolerate the pain."  Tr. 456.  At an appointment on December 14, 2011, Dr. Weisman reported that Gonzalez "is still having pain in his right elbow and right fourth and fifth fingers" and showed "decreased sensation and grip in the right hand."  Tr. 455.  Dr. Weisman diagnosed Gonzalez with chronic pain syndrome and recommended continuing narcotic therapy.  Tr. 455.

On December 14, 2011, Dr. Weisman completed his first assessment of Gonzalez's residual functional capacity ("RFC").  Tr. 377-78.  Dr. Weisman opined that Gonzalez could not lift or carry with either arm and indicated that he could only "rarely" reach, use hand controls, grasp, use fine finger manipulation, and feel with his fingers.  Tr. 377-78.  Dr. Weisman placed a question mark in the section asking how often Gonzalez could "use bilateral manual dexterity." Tr. 378.

In 2012, Gonzalez visited Dr. Weisman in February, May, June, and September.  Tr. 447-454.  During that time, Gonzalez reduced his use of Percocet from five times per day to four, and Dr. Weisman noted "reasonable control" of Gonzalez's right chronic upper extremity pain with Percocet.  Tr. 447.  In May of 2012, Dr. Weisman observed that Gonzalez was "able to extend and flex his fingers with some difficulty" and "is able to fully flex and extend his elbow."  Tr.

451.  However, the next month, Dr. Weisman observed that Gonzalez had "decreased sensation in his right fourth and fifth fingers compared to the left [hand]" as well as "decreased hand grasp [strength] with his right hand."  Tr. 449.  Dr. Weisman also noted that Gonzalez had undergone "ten operations on his right hand and right elbow" by 2012.  Tr. 453.

On January 3, 2013, Gonzalez reported worsening pain control, and Dr. Weisman added a prescription for MS Contin.  Tr. 446.  Dr. Weisman also recommended that Gonzalez seek a second opinion regarding the "management of his upper extremity chronic pain and neuropathy syndrome."  Tr. 446.

On January 18, 2013, Gonzalez sought a second opinion from Dr. Thomas Breen, reporting finger pain and numbness as well as "pain shooting up his arm and tenderness over his elbow."  Tr. 444.  Dr. Breen observed stiffness in Gonzalez's fingers and wrist and numbness and pain in the fourth and fifth fingers of Gonzalez's right hand.  Tr. 444.  Given Gonzalez's extensive surgical history, Dr. Breen postponed a diagnosis pending the results of an EMG and MRI.  Tr. 444.

During his annual physical with Dr. Weisman on February 1, 2013, Gonzalez reported improved pain management while on MS Contin and Percocet.  Tr. 442.  Dr. Weisman noted that Gonzalez was awaiting further follow-up by Dr. Breen and described Gonzalez's pain syndrome as "[u]nder reasonable control, currently undergoing further evaluation."  Tr. 443.  An EMG in February 2013 showed "no abnormalities in the right ulnar nerve and normal function of the left ulnar nerve."  Tr. 441; see Tr. 480-83.

In May 2013, Gonzalez stopped taking his prescribed narcotics, and Dr. Weisman observed that Gonzalez was experiencing withdrawal symptoms.  Tr. 441.  Dr. Weisman concluded that Gonzalez had "exhausted my repertoire of medications and interventions" and

urged Gonzalez to continue working with Dr. Breen and perhaps other physicians to reevaluate his pain management.  Tr. 441.  On June 6, 2013, Gonzalez reported "suffering since stopping his narcotics" six weeks earlier.  Tr. 440.  Dr. Weisman noted that Gonzalez had completed opioid withdrawal by this time and that Gonzalez's hand and elbow were now in "constant" pain.  Tr. 440.  Dr. Weisman agreed to Gonzalez's request to resume pain medication, remarking that Gonzalez "has never abused drugs since I have known him."  Tr. 440.  During a follow-up appointment later that month, Gonzalez reported having resumed taking Percocet but nonetheless complained of pain in his right hand that on "some days" was "constant."  Tr. 439.  Dr. Weisman observed some swelling in Gonzalez's right hand and hypersensitivity in his right fingers but noted full range of motion in Gonzalez's elbow and wrists.  Tr. 439.  Dr. Weisman repeated his diagnosis of general chronic pain syndrome in the upper right extremity and questioned the possibility of reflex sympathetic dystrophy.  Tr. 439.

Gonzalez followed up with Dr. Breen on July 9, 2013.  Tr. 438.  Dr. Breen stated that Gonzalez reported discomfort in his elbow and had a "markedly positive Tinel['s] sign" proximal to the cubital tunnel.  Tr. 438.  Dr. Breen noted that Gonzalez's MRI indicated "a compressive neuritis" at the same site, though an EMG was normal.  Tr. 438.  Dr. Breen opined that Gonzalez "would be a candidate for informal ulnar nerve decompression and anterior submuscular transposition" surgery.  Tr. 438.  After discussing these procedures with Gonzalez, Dr. Breen scheduled them for September 2013.  Tr. 438.  Before the surgery, during a follow-up appointment on July 26, 2013, Dr. Weisman observed that Gonzalez's pain was "[r]easonably controlled" and described Gonzalez's chronic pain syndrome as "adequately managed."  Tr. 437.

Dr. Breen performed ulnar nerve decompression and anterior intermuscular transposition surgery on September 4, 2013 at UMass Memorial.  Tr. 468-469.  The procedure was performed

without complications.  Tr. 468-69.  Gonzalez's preoperative and postoperative diagnoses were "[r]ight cubital tunnel syndrome."  Tr. 468.  Gonzalez reported to UMass Memorial's rehabilitation services on September 17 for an evaluation with occupational therapy, but Gonzalez then failed to follow up with occupational therapy until October 15, 2013.  Tr. 506.  On October 15, Gonzalez reported "some discomfort" post-surgery; Dr. Breen encouraged him to continue occupational therapy.  Tr. 492.  Gonzalez was reassessed by rehabilitation services at that time, but he then "canceled or no showed 2 visits within the next following 3 visits [sic]."  Tr. 506.  Gonzalez's final occupational therapy appointment was November 14, 2013.  Tr. 507.  During that visit, Gonzalez reported a pain level of "6/10 at the surgical site" and stated that "he is able to bathe and dress himself, [but he] still [has] difficulty with heavy activities."  Tr. 507.  The occupational therapist assessed Gonzalez's range of motion at the elbow as "within normal limits" and noted that Gonzalez's "[g]rip strength on the right is 5 pounds, [and] right lateral [is] 4 pounds."  Tr. 507.

In November 2013, Gonzalez reported to Dr. Weisman that he remained in chronic pain in his right arm and believed "his pain could be better managed."  Tr. 493.  Dr. Weisman observed swelling in Gonzalez's elbow and decided later that month to add two daily doses of Oxycontin 10 mg to Gonzalez's narcotic regimen.  Tr. 495, 498.

On January 7, 2014, Gonzalez followed up with Dr. Breen and reported "us[ing] his arm a little but more" and taking "occasional pain meds."  Tr. 496.  Dr. Breen noted that Gonzalez was "making slow, but steady progress" and observed that Gonzalez's elbow was "less tender" than previously.  Tr. 496.  Dr. Breen opined that it would "probably take another 3-6 months for [Gonzalez] to reach his maximal medical improvement."  Tr. 496.  Dr. Breen reported to rehabilitation services that Gonzalez's "problems were resolved and [he] had no issues" and that

Gonzalez "d[id] not have any [occupational therapy] needs" at that time.  Tr. 506-07.  Gonzalez was therefore discharged from occupational therapy on January 7.  Tr. 506.

On February 7, 2014, Gonzalez visited Dr. Weisman for an annual physical.  Tr. 499-500. Dr. Weisman repeated the diagnoses of cubital tunnel syndrome and chronic pain syndrome in the right upper extremity, but he noted that Gonzalez "has done well" and exhibited "some increasing movement in his right hand fingers."  Tr. 499-500.  Gonzalez reported increased movement of his right fingers but "no better control of his pain."  Tr. 499.  Dr. Weisman agreed to increase Gonzalez's Percocet regimen from twice per day to three times per day.  Tr. 499.

During a follow-up appointment in May 2014, Gonzalez reported still experiencing pain and intermittent swelling in the fourth and fifth fingers of his right hand.  Tr. 501.  Gonzalez also complained of feeling "somewhat overwhelmed with the responsibilities of raising two kids" and with "doing housework and trying to take care of things with no break."  Tr. 501.  However, Dr. Weisman noted that "for the first time since I have known [Gonzalez,] his right elbow pain is better . . . .  This is a new improvement status post his surgery."  Tr. 501.  Dr. Weisman opined that Gonzalez's chronic pain syndrome was "somewhat improved after surgery," though Gonzalez still had "a lot of symptoms" in his hands, particularly the "fourth and fifth fingers of the right hand."  Tr. 501.  Dr. Weisman also noted that Gonzalez "will continue his current narcotic regimen."  Tr. 502.

Gonzalez returned to UMass Memorial on June 10, 2014 for a nine-month follow-up on his right ulnar nerve decompression and transposition surgery.[4]  Tr. 503-05.  Dr. Breen again observed a positive Tinel's sign over the cubital tunnel and opined that Gonzalez's condition was "not entirely improved."  Tr. 503.  However, Gonzalez reported "that the pain is slightly

---

[4] The record of this encounter erroneously says "left ulnar nerve release" instead of right.

improved," and Dr. Breen noted that Gonzalez was making "some slow progress" since his most recent surgery.  Tr. 503.  Dr. Breen predicted that Gonzalez "should continue to improve over the next 6 months or so" and scheduled another follow-up appointment in six months' time "unless he is doing well."  Tr. 503-04.

On July 21, 2014, Dr. Weisman completed his second assessment of Gonzalez's residual functional capacity.  Tr. 517-18.  Dr. Weisman opined that Gonzalez could not use his right hand to lift and/or carry.  Tr. 517.  He also stated that Gonzalez could not use his right hand to perform any of the following activities: climb, reach, use hand controls, grasp, use bilateral manual dexterity, use fine finger manipulation, and feel with his fingers.  Tr. 518.

D.      State Agency Opinions

On June 6, 2013, Dr. Erik Purins, M.D., reviewed the record and found that Gonzalez had severe impairments of peripheral neuropathy and obesity.  See Tr. 156-59.  Dr. Purins opined that Gonzalez could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, and had limited ability to push and/or pull in both upper extremities.  Tr. 157-58.  Dr. Purins stated that Gonzalez was limited in handling in both hands and that Gonzalez's ability to grasp and twist was limited to only occasional bilaterally, but that his ability to reach, finger, or feel was unlimited.  Tr. 158.  Dr. Purins indicated that Gonzalez should avoid concentrated exposure to vibration and hazards.  Tr. 159.

On September 25, 2013, Dr. K. Malin Weeratne, M.D. reviewed the record and found that Gonzalez was limited to the same extent as found by Dr. Purins.  Tr. 167-70.

E.      Hearing Testimony

On August 6, 2014, ALJ Kim K. Griswold presided over an administrative hearing.  Tr.
58-115.  Gonzalez was represented by counsel, and a Vocational Expert (a "VE") gave
testimony.  Tr. 58-115.  ALJ Griswold also held a supplemental hearing on February 10, 2015 to
allow additional questioning of the Vocational Expert.  Tr. 36-57.

At the first hearing, Gonzalez testified that he last worked in construction, doing
demolition and carpentry in 2001.  Tr. 68-69.  He stated that he stopped working after being
injured in an industrial accident on January 16, 2001.  Tr. 68-69.  Gonzalez testified that all four
fingers of his right hand were amputated by a saw and that doctors could not surgically reattach
his middle finger.  Tr. 69.  Gonzalez said he could not bend his right fifth finger at all, could
"just barely" bend his right fourth finger where it meets his hand, and could only bend his right
index finger "a little bit . . . , not even halfway."  Tr. 71.  He testified that he "can't lift anything"
with his right hand and that he suffered pain that "goes from the elbow down to my right hand."
Tr. 73, 77.  Gonzalez testified that he could not hold onto things with his right hand and "cannot
use [his right hand] at all."  Tr. 82.  He also testified that he could only occasionally use his left
hand to lift objects weighing approximately five pounds before that hand would begin to hurt
from overuse.  Tr. 73.  He stated that he was diagnosed with mild carpal tunnel in his left hand
and also suffered knee pain.  Tr. 81, 83.

Gonzalez testified that he is right-handed and learned to use his left hand to eat, drink,
and carry some items, like groceries, after his industrial accident.  Tr. 71-73.  He stated that he
needed his wife's help buttoning his shirt, tying his shoes, cutting food, and opening jars.  Tr. 71-
72, 84.  He said he relied on his wife to cook, clean, and do laundry and that his wife would
leave food for him to give to his children while she worked.  Tr. 76-77, 84-85.  Gonzalez stated

12

that he did not participate in any hobbies or outside activities but did watch television and care for his two children aged three and five.  Tr. 74-76.  According to his testimony, he watched his children during the day while his wife worked, read books to them, and sometimes "color[ed] a book with them."  Tr. 74-75.

Gonzalez testified that he had previously taken oxycodone and OxyContin for pain management but was not on any medications at the time of the hearing.  Tr. 77-79.  He stated that his doctor stopped prescribing those medications in order to "reevaluate" and "see if he [could] give me something different . . . that [would] help me with the pain."  Tr. 77.  Gonzalez testified that he stopped taking medication around July 25, 2014, approximately two weeks prior to the hearing, and described his pain as "much worse" as a result.  Tr. 78-79.

Following Gonzalez's testimony, as well as additional questions by the ALJ to clarify the details of Gonzalez's occupational history, the ALJ asked the Vocational Expert for the VE's assessment of the skill and exertional levels indicated in Gonzalez's work history.  See Tr. 92-100.  The ALJ then asked the VE to consider a hypothetical individual of Gonzalez's age, educational background, and past work experience with the residual functional capacity to

> lift and carry up to 20 pounds occasionally and 10 pounds frequently.  And the right upper extremity is used for guidance.  There is no overhead reaching with— or work activity with the right upper extremity.  Occasional handling for this hypothetical with the bilateral upper extremities and occasional exposures to vibration and hazards such as dangerous moving machinery and unprotected heights.

Tr. 100.  The VE testified that this hypothetical individual could not perform Gonzalez's past work but could perform unskilled work at the sedentary exertion level.  Tr. 100-01.  The VE specifically identified 96,260 surveillance system monitor jobs nationally that the hypothetical individual could perform and 1,650 such positions in Massachusetts.  Tr. 100-01.  The VE stated that the position of surveillance system monitor has the Dictionary of Occupational Title (DOT)

number 379.367-010 and "can exist in a corporate security setting, but it also can be . . . somebody who works in a condominium complex . . . ." Tr. 101.  The VE further testified that such an individual also could perform unskilled work at the light exertion level, specifically identifying 106,770 usher and ticket taker jobs nationally and 2,310 such positions in Massachusetts.  Tr. 101.

The ALJ then posed a second hypothetical that was identical to the first hypothetical, except

> instead of occasional handling with the bilateral upper extremities, it's now less restrictive and provides for occasional handling with the right dominant upper extremity only.  No overhead reaching with the right dominant upper extremity. Now additionally, the individual can occasionally crawl and kneel because that would—might require the use of their arms for guidance and the hands, there's no limits, however, on stooping and balancing and climbing ramps and stairs.  They cannot climb ladders, ropes, or scaffolds.

Tr. 104.  The ALJ described this second hypothetical as "a little different . . . , a little bit less restrictive in some ways, but contain[ing] some postural limitations."  Tr. 104.  The VE replied that such an individual could perform the same jobs as the first hypothetical individual the ALJ described.  Tr. 104-05.

The ALJ later asked the VE to consider a third hypothetical, this one identical to the first hypothetical but with the additional limitation of "lifting and carrying up to 5 pounds frequently."  Tr. 106.  The Vocational Expert testified that such an individual would not be employable "at the sedentary level or any other level."  Tr. 106.

Gonzalez's attorney then cross-examined the Vocational Expert about the VE's professional experience placing "people with severely impaired dominant . . . upper limbs in employment."  Tr. 106.  The VE stated that he had experience assessing such cases as a vocational expert but had not personally handled placing such an individual in a job.  Tr. 106-08.

14

The ALJ then asked the VE if there were jobs available if the hypothetical individual's limitations specifically applied to the dominant hand, analogizing this individual to "[t]he one[-]armed man" who cannot use his dominant hand at all.  Tr. 110.  The Vocational Expert responded that the same jobs previously cited would be available.  Tr. 111.

The hearing concluded shortly thereafter due to scheduling constraints, and the VE's testimony continued at a supplemental hearing held several months later.[5]  See Tr. 38-39, 114-15.  At the supplemental hearing, Gonzalez's attorney asked the VE to consider the same limitations as in the ALJ's initial hypothetical, with the additional restriction that "the dominant hand[] had no useful function."  Tr. 51.  The vocational expert responded that he could identify no jobs available to such an individual.  Tr. 52.

Gonzalez's attorney also questioned the Vocational Expert about the nature of the surveillance system monitor job.  The VE clarified that the DOT code he referenced in prior testimony specifically applied to government jobs as surveillance system monitors, mainly in transportation facilities.  Tr. 39-40.  The ALJ asked the VE if there were "surveillance system monitor jobs outside the Department of Transportation that you can testify to, based on your experience in today's economy"; the VE replied, "Oh, absolutely."  Tr. 42.  When asked if those were the positions to which the VE had referred in his prior testimony, the VE responded, "Exactly."  Tr. 42.  The VE stated that surveillance system monitor jobs are common in the retail and housing complex settings.  Tr. 42-43.  He clarified that he used the DOT number for government service surveillance system monitor jobs "[b]ecause there isn't a better one" to use. Tr. 45-46.  The VE also stated that the DOT number "does apply to most civilian jobs."  Tr. 46. When the ALJ asked the VE to "explain from your experience and your knowledge of the DOT,

---

[5] ALJ Griswold presided at both hearings.  See Tr. 58.

and your professional experience, . . . what makes it reasonable to use this number for non-government jobs," the VE replied, "the skills specifications, the nature of the duties being performed, [and] the posture."  Tr. 46.

Gonzalez's attorney then questioned the VE about the required exertional levels for the jobs of ticket taker and usher and about the numbers of those jobs available in the national and Massachusetts economies.  Tr. 52-54.  The VE clarified that the ticket taker and usher jobs are "both in the same group as part of job numbers" but had different exertional levels.  Tr. 52-53.  He stated that the usher position involved occasional handling, reaching, and fingering, while the ticket taker position required frequent handling and reaching and occasional fingering.  Tr. 52-53.  The ALJ then asked the VE "what would be a reasonable reduction" in the number of available jobs if the ALJ's initial hypothetical had specified occasional, but not frequent, handling.  Tr. 53.  The VE testified that he would reduce his initial figure of 2,310 jobs in Massachusetts by one-third.  Tr. 54.[6]

Gonzalez's attorney repeatedly questioned the VE about his references to job descriptions found in the Occupational Information Network (O*NET).  See Tr. 43, 46, 48, 112.  The VE voiced criticism of that online database, explaining that "those of us who practice as vocational experts stay away from the O*NET because it isn't considered science."  Tr. 43-44.  The VE testified that he did not rely on O*NET for job descriptions and numbers, but rather was "looking at a universe of jobs that's in the Dictionary of Occupational Titles."  Tr. 45.  The ALJ also noted during the hearing that "[w]e don't take administrative notice of the O*NET, so it's not relevant.  The Agency does not rely on the O*NET."  Tr. 49.

---

[6] The Vocational Expert at first referred to a reduction of "one-third or ultimately two-thirds" but then clarified, "[M]y testimony was to actually reduce the number by one-third."  Tr. 54.

F.        Administrative Decision

In assessing Gonzalez's application for benefits, the ALJ[7] conducted the familiar five-step sequential evaluation that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 416.920; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he or she is "doing substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that he or she is not disabled.  Id.  Here, the ALJ found that Gonzalez had not engaged in substantial gainful activity since Gonzalez's application date of March 29, 2013.  Tr. 14.

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe" and of sufficient duration.  20 C.F.R. § 416.920(a)(4)(ii).  The ALJ determined that Gonzalez had the following severe impairments: right ulnar neuroma and cubital tunnel syndrome, bilateral carpal tunnel syndrome, right hand partial amputation of three fingers, and obesity.  Tr. 15.

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1 and also meets the duration requirement, then the claimant is disabled.  Id.  Here, the ALJ found that Gonzalez did not have

---

[7] After the supplemental hearing, Gonzalez's application was transferred from ALJ Griswold to ALJ Addison C.S. Masengill.  See Tr. 31 & n.1 (citing S.S.A. Office of Hrgs. & Appeals, Hearings, Appeals, and Litigation Law Manual ("HALLEX") § I-2-8-40 ("Administrative Law Judge Conducts Hearing but Is Unavailable to Issue Decision"), 1993 WL 643064).  ALJ Masengill authored the decision disposing of Gonzalez's application.

an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  Tr. 16.

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  If the ALJ determines that the claimant has a significant impairment, but not an "Appendix 1 impairment," then the ALJ must determine the claimant's RFC.  Id. § 416.920(e).  An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments.  20 C.F.R. § 416.945(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.").  In this case, the ALJ determined that Gonzalez

> has the residual functional capacity to perform light work as defined [by regulation,] except that [he] can use his right upper extremity for guidance while lifting and carrying.[8]  He can perform occasional handling and fingering with the right dominant upper extremity.  He cannot perform overhead reaching or work activity with the dominant right upper extremity.  He cannot crawl (due to [his] right upper extremity) or climb ladders, ropes, or scaffolds.  He has no limitations in stooping (bending at [the] waist) or balancing.  He can occasionally crouch, kneel, and climb ramps and stairs.  He can tolerate occasional exposure to hazards, such as dangerous moving machinery and unprotected heights.  He can tolerate occasional exposure to vibration with [the] right dominant upper extremity.

Tr. 16 (footnote added).  The ALJ then determined that Gonzalez's RFC precluded a return to any past relevant work.  Tr. 28.

At the fifth step, the ALJ asks whether the claimant's impairments prevent him or her from performing other available work.  20 C.F.R. § 416.920(a)(4)(v).  Based upon Gonzalez's RFC and the VE's testimony, the ALJ concluded that Gonzalez could perform jobs that exist in

---

[8] Social Security regulations define "light work" as work that

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

significant numbers in the national economy.  Tr. 29.  Accordingly, the ALJ found that Gonzalez

was not disabled at any time from March 29, 2013, through June 26, 2015.  Tr. 31.

II.      STANDARD OF REVIEW

The Court may enter "a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing."  42

U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings if they are

supported by substantial evidence and the Commissioner has applied the correct legal standard.

Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if

a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate

to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs.,

647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record may support multiple

conclusions, the Court must uphold the Commissioner's findings when they are supported by

substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st

Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than

a preponderance of the evidence.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57

(1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial

evidence does not mean that the Commissioner's decision is unsupported by substantial

evidence.

The plaintiff carries the burden of proving that he or she is disabled within the meaning

of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff also

bears the burdens of production and persuasion at steps one through four, but not five, of the

sequential evaluation process described above.  Id. at 146 n.5; Vazquez v. Sec'y of Health &

Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing the

plaintiff's RFC.  20 C.F.R. § 416.912(a).

III.     ANALYSIS

A.     Weight of Opinions

Gonzalez argues that the ALJ improperly discounted the opinions of Dr. Weisman, his

treating physician, without providing adequate reasoning and without substantial evidentiary

support.  Docket #18 at 7-11.  Contrary to Gonzalez's contention, I find that the ALJ sufficiently

explained the decision to discount Dr. Weisman's opinions and that substantial evidence

supports that decision.

A treating physician's opinion as to the nature and severity of a claimant's impairments is

entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. § 416.927(c)(2).  However, if a treating physician's opinion "is inconsistent

with other substantial evidence in the record, the requirement of 'controlling weight' does not

apply," and the ALJ may afford the treating physician's opinion little weight or no weight at all.

Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037, 1994 WL 251000, at *3 (1st Cir. 1994)

(per curiam) (table); see Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (citing 20

C.F.R. §§ 404.1527(d)(2)-(4), 416.927(d)(2)-(4)) (noting that Social Security regulations "permit

the ALJ to downplay the weight" afforded a treating physician's opinion when that opinion "is

internally inconsistent or inconsistent with other evidence in the record").

The ALJ must provide "good reasons" when choosing not to assign a treating physician's

opinion controlling weight.  20 C.F.R. § 416.927(c)(2).  The ALJ also must consider the

following factors when determining how much weight to assign a treating physician's opinion:

the length, nature, and extent of treatment and the frequency of the physician's examination; the

opinion's supportability and consistency with the record as a whole; the physician's area of

specialization; and any other relevant factors that support or contradict the opinion.  Id. § 416.927(c).  The ALJ need not discuss each individual factor.  Healy v. Colvin, No. 12-30205-DJC, 2014 WL 1271698, at *14 (D. Mass. Mar. 27, 2014) (citing Delafontaine v. Astrue, No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011)).  If the ALJ affords less weight to a treating physician's opinion after considering these factors, remand is inappropriate so long as the ALJ's reasons for doing so are "sufficiently clear" and "substantial evidence supports [the ALJ's] decision."  Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 2008).[9]

Here, the ALJ did not give controlling weight to either of Dr. Weisman's RFC assessments, affording no weight to Dr. Weisman's 2011 opinion and only partial weight to Dr. Weisman's 2014 opinion.  Tr. 26-28.  The ALJ rejected Dr. Weisman's 2011 assessment that Gonzalez could not lift or carry with either arm, finding that this opinion "conflicts with orthopedic examinations of the claimant, which indicated no muscle atrophy, treatment records which indicated good response to surgeries and no use of narcotics since July 2014, and an ability to partake in several activities of daily living."[10]  Tr. 26.  The ALJ then afforded little weight to Dr. Weisman's 2014 opinion that Gonzalez could not lift or carry any weight with his right arm, observing that this 2014 assessment "conflicts with the results of physical examination of the claimant, which revealed no evidence of muscle atrophy," was inconsistent with

---

[9] For example, in Bourinot v. Colvin, 95 F. Supp. 3d 161 (D. Mass. 2015), the ALJ assigned little weight to the opinions of the plaintiff's treating physicians because the ALJ found their opinions inconsistent with "medical records, treatment notes, and Plaintiff's descriptions of her physical activities."  Id. at 177.  The ALJ "describe[d] Plaintiff's medical treatment history in considerable detail" and reasonably inferred that the treating physicians' opinions were inconsistent with that evidence.  Id.  The District Court found that the ALJ's "reasoning [was] sufficiently specific" and found that remand not required because "it can be ascertained from the entire record and the ALJ's opinion that the ALJ 'applied the substance' of the treating physician rule."  Id. (quoting Botta v. Barnhart, 475 F. Supp. 2d 174, 188 (E.D.N.Y. 2007)).

[10] The ALJ also observed that Dr. Weisman's 2011 opinion was inconsistent with Dr. Weisman's later assessment in 2014, which noted no exertional limits for Gonzalez's left upper extremity.  Tr. 26.

"treatment records [that] also indicated good response to surgeries," and conflicted with record evidence that Gonzalez had ceased using narcotics for two weeks prior to the hearing and could engage in "activities of daily living."  Id.

While the ALJ did not expressly consider each factor listed in 20 C.F.R. § 416.927(c) in determining whether to assign controlling weight to a treating physician's opinion, the ALJ repeatedly noted that Dr. Weisman's opinions were inconsistent with the record as a whole and conflicted with the objective medical evidence.  Tr. 26-27.  Specifically, the ALJ discussed the most recent treatment notes in the record, which indicated that Gonzalez had some ability to use his right upper extremity and that his condition improved after his 2013 surgery.[11]  Tr. 27.  The ALJ also considered that Gonzalez had stopped using pain medication during the two weeks prior to the hearing despite having previously been on narcotics for three years, and the ALJ observed that Gonzalez inconsistently attended occupational therapy following his 2013 surgery.[12]  Tr. 25-27.

I find that the ALJ accurately interpreted Gonzalez's more recent treatment notes as conflicting with Dr. Weisman's assessments of Gonzalez's RFC.  Dr. Weisman's notes from February and May 2015 state that Gonzalez "has done well" and showed "some increased function" in his right hand after surgery, and Dr. Weisman remarked that "for the first time since I have known [Gonzalez,] his right elbow pain is better . . . .  This is a new improvement status post his surgery."  Tr. 499-501.  I find that the ALJ did not err in concluding that these notes conflict with Dr. Weisman's earlier, more negative assessments of Gonzalez's RFC.  I also find

---

[11] Dr. Weisman's notes from February and May 2015 state that Gonzalez "has done well" and showed "some increased function" in his right hand after surgery, and Dr. Weisman remarked that "for the first time since I have known [Gonzalez,] his right elbow pain is better . . . .  This is a new improvement status post his surgery."  Tr. 499-501.

[12] The ALJ noted that "there is evidence that the claimant has not been entirely compliant in attending occupational therapy, which suggests that the symptoms may not have been as limiting as the claimant has alleged."  Tr. 25.

22

that the ALJ properly considered Gonzalez's discontinuance of pain medication and irregular attendance at occupational therapy when deciding how much weight to afford Dr. Weisman's assessments.  See, e.g., Light v. Astrue, No. 08 Civ. 1853(PKC), 2009 WL 2191211, at *15 (S.D.N.Y. July 20, 2009) (finding that the ALJ properly concluded that the plaintiff's choice to discontinue beneficial medications "was inconsistent with the opinion of the treating physician"); cf. 20 C.F.R. § 404.1530(a)-(b) ("In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work. . . .  If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . .").

The ALJ also opined that Gonzalez's ability to engage in "activities of daily living," including providing childcare for his two children, conflicted with Dr. Weisman's opinion that Gonzalez was unable to use his right hand.  Tr. 26-27.  Substantial evidence supports this finding, as well.  Gonzalez testified that the only activities in which he could engage without his wife's help were eating (without cutting his own food); using the bathroom; watching TV; and caring for his children while his wife worked, including reading to them and microwaving prepared meals.  Tr. 17, 19, 71-77.  However, During Gonzalez's final occupational therapy appointment—which occurred on November 14, 2013, after his final surgery—he reported that "he [wa]s able to bathe and dress himself," though he "still [had] difficulty with heavy activities."  Tr. 507.  Further, in May 2014, Gonzalez complained to Dr. Weisman of feeling "somewhat overwhelmed with the responsibilities of raising two kids" and with "doing housework and trying to take care of things with no break," Tr. 501—this during the same appointment at which Dr. Weisman recorded that "for the first time since I have known [Gonzalez,] his right elbow pain is better . . . .  This is a new improvement status post his

surgery." Tr. 501.  These facts in the record militate against Dr. Weisman's assessment that

Gonzalez could not use his right hand at all.  I therefore find that the ALJ's analysis of

Gonzalez's "activities of daily living" has sufficient evidentiary support.  Cf. Rodriguez, 647

F.2d at 222 (explaining that substantial evidence exists "if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support [the Commissioner's]

conclusion"); Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003)

(citing Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor, 688 F.2d 862,

865 (1st Cir. 1982)) ("While 'substantial evidence' is 'more than a scintilla,' it certainly does not

approach the preponderance-of-the-evidence standard normally found in civil cases.").  This

analysis substantially supports the ALJ's decision not to assign controlling weight to Dr.

Weisman's opinions.

 Finally, the ALJ found that Gonzalez's lack of atrophy in the upper right extremity was

inconsistent with Dr. Weisman's opinion that Gonzalez was unable to use his right hand.  Tr. 20.

While it is true that Gonzalez appears never to have presented with atrophy, the record does not

include any evidence indicating that someone with Gonzalez's alleged disability would exhibit

that condition.  I therefore find that the ALJ improperly engaged in conjecture when finding,

with no supporting evidence in the record, that Gonzalez's lack of muscular atrophy undercut Dr.

Weisman's medical assessments.[13]  See Camp v. Astrue, No. 4:08CV0022 AGF, 2009 WL

701716, at *8 (E.D. Mo. Mar. 13, 2009) (citing Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.

2000) ("An administrative law judge may not draw upon his own inferences from medical

---

[13] While I find that the ALJ improperly considered Gonzalez's lack of muscular atrophy when deciding how much weigh to afford Dr. Weisman's assessments, as discussed below, a lack of muscle atrophy when a claimant alleges severe pain can properly play a role in the ALJ's assessment of the claimant's credibility as a witness.  See infra.

reports.")) ("[T]he ALJ's statement regarding pain and muscle atrophy or loss of tone is a medical determination, not in the province of an ALJ.").

Despite this misstep, however, I find that the ALJ provided sufficient good reasons, supported by the record, for discounting Dr. Weisman's assessments—namely, that Dr. Weisman's assessments were inconsistent with recent treatment notes and Gonzalez's lack of pain medication and conflicted with Gonzalez's self-assessments during occupational therapy, as discussed above.  Accordingly, while I find that the ALJ's discussion of the absence of atrophy in Plaintiff's medical history lacks sufficient evidentiary support, I nonetheless affirm the ALJ's treatment of Dr. Weisman's assessments.  See, e.g., Perez Torres v. Sec'y of Health and Human Servs., 890 F.2d 1251, 1255 (1st Cir. 1989) (affirming the Commissioner's decision where the ALJ committed harmless error); cf. Bath Iron Works Corp., 336 F.3d at 56 (citing Sprague, 688 F.2d at 865) (explaining that the substantial evidence requirement "does not approach the preponderance-of-the-evidence standard normally found in civil cases").  In other words, I find that substantial evidence reasonably can be viewed as inconsistent with Dr. Weisman's assessments that Gonzalez had no ability to use the upper right extremity at all.  I therefore find that, with respect to the ALJ's treatment of Dr. Weisman's assessments, "a reasonable mind . . . could accept [the evidence] as adequate to support" the ALJ's conclusion.  Rodriguez, 647 F.2d at 222.  I therefore find no error in the manner in which the ALJ applied the treating physician rule in this case.  See, e.g., Irlanda Ortiz, 955 F.2d at 770; see also 20 C.F.R. § 416.927(c)(2)-(6).

B.      Credibility Determination

Next, Gonzalez argues that the ALJ erred by failing to properly consider Gonzalez's subjective complaints, and he claims that this error resulted in a flawed RFC.  See Docket #18 at 11-14.  The ALJ found that Gonzalez's medically determinable impairments could reasonably be

expected to cause the symptoms Gonzalez alleged; but the ALJ then found Gonzalez's statements concerning the intensity, persistence, and limiting effects of those symptoms not entirely credible.  Tr. 19.

An ALJ makes a proper credibility determination when the determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he considered in determining to disbelieve" the applicant.  Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986).  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa, 803 F.3d at 26).[14]  Before finding a claimant's allegations of disability not credible, the ALJ must gather "detailed descriptions of [the] claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors."  Baez Velez v. Sec'y of Health & Human Servs., 993 F.2d 1530, 1993 WL 177139, at *6 (1st Cir. 1993) (per curiam) (table).  These descriptions, known as the "Avery factors," must be considered carefully by the ALJ.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

Here, I find that the ALJ properly considered the record and factors reflecting Gonzalez's credibility respecting his impairments.  The ALJ advanced several reasons, each of which touches on the Avery factors, for finding Gonzalez not credible.  I find that the record supports

---

[14] Notably, ALJ Masengill decided Gonzalez's application but did not preside over Gonzalez's administrative hearings.  See supra note 7.  ALJ Masengill thus did not observe or evaluate Gonzalez's demeanor in person. Rather, her written opinion reveals that she based her determination of Gonzalez's credibility on "how [Gonzalez's] testimony fit in with the rest of the evidence."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citation omitted).

four of these reasons; and I further find that these four reasons amount to substantial evidence sufficient to affirm the ALJ's determination of Gonzalez's credibility.

First, in finding Gonzalez not credible, the ALJ cited "a substantial disparity" between Gonzalez's statements and the objective medical findings in the record, which the ALJ discussed at length.  Tr. 21-26.  While Gonzalez testified that he is completely unable to use his right hand, treatment notes from Drs. Weisman and Breen, as well as notes from Gonzalez's occupational therapist, all indicate that Gonzalez had some use of his right upper extremity and that his condition showed signs of improvement.  Tr. 496, 499-501, 503-505, 507.  Additionally, the ALJ relied on the opinions of Drs. Purins and Weeratne—namely, their assessments that Gonzalez had more use of his upper right extremities than he alleged.  Tr. 27-28, 156-59, 167-70.  I find that the ALJ did not err in concluding that the treatment notes and medical findings of Drs. Weisman, Breen, Purins, and Weeratne generated a "substantial disparity" with Gonzalez's testimony.

Second, in assessing Gonzalez's credibility, the ALJ also focused on Gonzalez's lack of muscle atrophy in the upper right extremity.  Tr. 20.  When a claimant alleges severe pain, a lack of muscle atrophy can factor into in the ALJ's assessment of the claimant's credibility.  See, e.g., Ramos-Albelo v. Sec'y of Health & Human Servs., 979 F.2d 844, 1992 WL 340884, at *3 (1st Cir. 1992) (per curiam) (table); Matos v. Astrue, 795 F. Supp. 2d 157, 165 (D. Mass. 2011); see also O'Connor v. Chater, 164 F.3d 618, 1998 WL 695418, at *1 (2nd Cir. 1998) (table). Accordingly, I find that the ALJ properly considered Gonzalez's lack of atrophy when assessing of the credibility of Gonzalez's statements concerning his symptoms' intensity, persistence, and limiting effects.

Third, the ALJ relied on Gonzalez's testimony that Gonzalez had not taken any pain medications for two weeks before the hearing, despite alleging symptoms of "constant, incapacitating pain." Tr. 20. Social Security regulations recognize Gonzalez's change of medication as a reasonable factor for the ALJ to consider here. See 20 C.F.R. § 416.929(c)(3)(iv) (instructing that the ALJ will consider "the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" when evaluating the claimant's symptoms). I find proper the ALJ's conclusion that suddenly stopping pain medication after three years of narcotic treatment reasonably could be viewed as inconsistent with Gonzalez's allegations of "constant, incapacitating pain." Tr. 20.

Fourth, the ALJ deemed Gonzalez's testimony in conflict with Gonzalez's ability to engage in activities of daily living. Specifically, the ALJ found Gonzalez's ability to "care[] for his children, ages five and seven" and to "warm up meals in the microwave for them" inconsistent with Gonzalez's allegedly disabling symptoms. Tr. 20. As explained above, the record reflects that Gonzalez told his occupational therapist that he could "bathe and dress himself," Tr. 507, and that Gonzalez told Dr. Weisman he felt "somewhat overwhelmed with the responsibilities of raising two kids" and "doing housework and trying to take care of things with no break," Tr. 501. As is also the case respecting the ALJ's decision to discount Dr. Weisman's assessments of Gonzalez's RFC, see supra, these statements amount to substantial evidence in support of the ALJ's choice to discredit Gonzalez's testimony. I therefore find that the ALJ did not commit error in finding that Gonzalez's daily activities generated "significant inconsistencies" with Gonzalez's testimony about his own impairments.

Finally, the ALJ highlighted an alleged gap in Gonzalez's medical treatment records between 2001 and 2007. Tr. 20. Unlike the reasons for discounting Gonzalez's testimony

discussed above, I find this reason unsupported by the record: As Defendant concedes, the ALJ's statement that Gonzalez did not receive documented medical treatment or complain of hand pain prior to 2007, Tr. 20, is incorrect.  See Tr. 117-25 (treatment records from 2004 and 2005).

Although I find that one of the ALJ's five reasons for discrediting Gonzalez's testimony lacks support, I find that remand is not appropriate on this point.  As discussed above, the ALJ offered several valid reasons for discrediting Gonzalez's testimony: Treatment notes and medical assessments by multiple doctors reasonably can be viewed as conflicting with some of Gonzalez's representations during the hearing, Gonzalez never exhibited muscle atrophy, he chose to discontinue pain medication despite testifying that he suffered severe chronic pain, and his statements concerning activities of daily living reasonably can be viewed as conflicting with his alleged impairments.  I find that those reasons amount to substantial evidence supporting the ALJ's negative assessment of Gonzalez's credibility; and I therefore deem harmless the ALJ's misstatement that the record lacks evidence of treatment prior to 2007.  See Ward, 211 F.3d at 656 (finding that "there was no harm from the ALJ's use of an erroneous ground of decision because there was an independent ground on which affirmance must be entered as a matter of law").

C.      Vocational Expert Testimony

In addition to challenging the ALJ's application of the treating physician rule and the ALJ's assessment of Gonzalez's credibility as a witness, Gonzalez also impugns the Vocational Expert testimony on which the ALJ relied in finding him not disabled.  I turn now to this subject.

1.      Conflicts with the Dictionary of Titles

Gonzalez raises two issues regarding the Vocational Expert's testimony and the Dictionary of Occupational Titles (the "DOT").  One relates to the VE's testimony about the

29

surveillance system monitor job, and the other relates to the jobs of ticket taker and usher.  I
address these issues in turn.

i.    Surveillance System Monitor

First, Gonzalez argues that the VE's testimony about the position of surveillance system
monitor conflicts with the DOT and lacks requisite evidentiary support.  Regulatory guidance
from the Social Security Administration instructs that "[o]ccupational evidence provided by a
VE . . . generally should be consistent with the occupational information supplied by the DOT."
SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000).  However, when a VE's testimony
and the DOT conflict, "the hearing officer must resolve the conflict and 'provide[] a basis for
relying on the [vocational expert's] testimony rather than on the DOT information.'"  Sanchez v.
Colvin, 134 F. Supp. 3d 605, 620 (D. Mass. 2015) (quoting Szumylo v. Astrue, 815 F. Supp. 2d
343, 440 (D. Mass. 2011)).  More specifically, "the adjudicator must elicit a reasonable
explanation for the conflict before relying on the VE or VS[15] evidence to support a determination
or decision about whether the claimant is disabled."  SSR 00-4p, 2000 WL 1898704, at *2
(footnote added).  Regulations expressly permit a VE to rely on his or her "experience in job
placement or career counseling" when testifying "about information that the DOT does not
contain."  Id.

At issue here is whether the ALJ elicited a sufficient, reasonable explanation for relying
on the VE's testimony respecting the job of surveillance system monitor.  At Gonzalez's first
hearing, the VE testified that the DOT entry for surveillance system monitor encompasses both
government and private-sector jobs.  See Tr. 100-101 ("[S]urveillance system monitor . . . is a
job that can exist in a corporate security setting . . . [or] in a condominium complex . . . .  And

---

[15] "VS" refers to Vocational Specialists, who are similar to VEs.  See SSR 00-4p, 2000 WL 1898704, at *1 (S.S.A. Dec. 4, 2000).

that is DOT Number 379.367-010 . . . .").  The VE later conceded, at Gonzalez's supplemental

hearing, that this was incorrect: The DOT entry for surveillance systems monitor in fact only

describes government jobs.  See Tr. 40; see also Dict. of Occupational Titles § 379.367-010 (4th

ed. rev. 1991), 1991 WL 673244 (describing the surveillance system monitor job as within the

"[g]overnment [s]ervices" industry).  At the ALJ's prodding, the VE explained at the

supplemental hearing that this DOT code formerly applied to transportation workers who

primarily worked in airports, but those airport jobs changed after the terrorist attacks on

September 11, 2001.  See Tr. 41.  The VE testified that the transportation jobs formerly classified

under DOT code 379.367-010 still exist.  Tr. 42.  He then explained that he used DOT Code

379.367-010 to describe non-government surveillance system monitor jobs "primarily because

there isn't [a] better" DOT code to use.  Tr. 43.  The VE further testified, "based on [his]

experience in today's economy," that non-governmental surveillance system monitor jobs exist,

describing positions in retail stores and housing complexes.  Tr. 42-43.

The ALJ later asked the VE what authority bolstered the VE's testimony about non-

government surveillance system monitor jobs.  Tr. 45.  The VE replied that he had considered

the "universe of jobs" that the DOT describes.  Tr. 45.  The VE also clarified that no DOT code

describes private-sector surveillance system monitor jobs, and he reiterated that he used the DOT

code for government jobs "[b]ecause there isn't a better one."  Tr. 45-46.  The ALJ then asked

the VE to "explain from your experience and your knowledge of the DOT, and your professional

experience, . . . what makes it reasonable to use this number for non-government jobs?"  Tr. 46.

The VE replied, "The skill specifications, the nature of the duties being performed, [and] the

posture."  Tr. 46.

Gonzalez protests that the VE impermissibly offered nothing beyond his own say-so to support his testimony about surveillance system monitor jobs in the private sector.  I disagree. As explained above, Social Security regulations permit an ALJ to rely on vocational expert testimony about "information not listed in the DOT" so long as the ALJ "elicit[s] a reasonable explanation" for the VE's testimony.  See SSR 00-4p, 2000 WL 1898704, at *2.  Indeed, the relevant regulation instructs, "Information about . . . occupations not listed in the DOT may be available . . . from a VE's . . . experience in job placement or career counseling."  Id.  Here, the Commissioner does not dispute that the DOT title for the surveillance system monitor job specifically refers to government work.  See Dict. of Occupational Titles § 379.367-010, 1991 WL 673244.  Further, the VE testified about private-sector surveillance system monitor jobs "from [his] experience and [his] knowledge of the DOT, and [his] professional experience . . . ." Tr. 46.  I find that the VE's testimony based on his professional experience complies with the regulations' requirements.  See, e.g., Barker v. Astrue, Civ. No. 09-437-P-S, 2010 WL 2680532, at *4-5 (D. Me. June 29, 2010) (collecting cases) (explaining that a VE's professional experience is a "reasonable explanation" for a conflict between the VE's testimony and the DOT).  I therefore find that the ALJ did not err in choosing to rely on the VE's testimony respecting private-sector surveillance system monitor jobs not listed in the DOT.

I also note that the jobs numbers provided by the VE at Gonzalez's first hearing— namely, that there are available 96,260 surveillance system monitor jobs nationally and 1,650 such jobs in Massachusetts—referred to employment classified under DOT Code 379.367-010, which only encompasses government jobs.  See Tr. 101.  The VE's testimony regarding non-governmental surveillance system monitor jobs therefore does not impact these figures, which the ALJ deemed "significant numbers" of jobs that Gonzalez can perform.  Tr. 29.  Indeed, to the

extent that Gonzalez retains the capacity to perform any private-sector surveillance system monitor jobs, this would only increase the "significant" jobs numbers to which the VE testified. Tr. 29.

ii.     Usher and Ticket Taker

Second, Gonzalez challenges the VE's testimony about the number of usher and ticket taker jobs available to him.  See Docket #18 at 17; Tr. 51-56.  At Gonzalez's first hearing, the VE identified 106,770 usher and ticket taker jobs nationally, and 2,310 such positions in Massachusetts, that someone with Gonzalez's RFC could perform.  Tr. 101.  However, the VE acknowledged at the supplemental hearing that the usher and ticket taker positions have different exertional requirements: An usher performs occasional handling and fingering, while a ticket taker performs "frequent reaching, . . . frequent handling, and occasional fingering."  Tr. 52-53. The VE explained that ushers and ticket takers are nonetheless "in the same group as part of job numbers."  Tr. 53.  In order to calculate the number of usher and ticket taker jobs available to someone limited to occasional handling, the VE reduced by one-third the total number of such jobs that exist.  See Tr. 53-54.

Gonzalez urges that the VE failed to sufficiently explain this one-third reduction to the number of usher and ticket taker jobs.  I disagree.  The VE's one-third reduction was in response to the ALJ's question, "To the best of your professional ability, what would be a reasonable reduction in any numbers that you previously provided [of usher and ticket taker jobs in the local economy]?"  Tr. 53.  The VE stated, and then reiterated for clarity, that a reasonable reduction to account for eliminating the position of ticket taker (because of its requirements of frequent reaching and frequent handling) would be one-third.  Tr. 53-54.

The "professional ability" on which this reduction was based is extensive.  The VE in this case holds a Ph.D. in rehabilitation counseling and has worked as a VE since 2009, taught undergraduate and graduate courses at seven institutions of higher learning, and published numerous academic articles on rehabilitation and disability management.  See Tr. 240-44. Gonzalez has not challenged these qualifications.  See Tr. 30.  As noted above, Social Security regulations permit a VE to rely on his or her experience in job placement or career counseling when testifying about occupational information that the DOT does not contain.  See SSR 00-4p, 2000 WL 1898704, at *2.  That is precisely what happened here.

This policy to permit VEs to testify based on their experience and expertise makes sense. Indeed, as courts in this and another district have explained, "[a] vocational expert's testimony must be based on estimates by its very nature.  The social security scheme does not contemplate that vocational experts will have the benefit of actual market surveys for each case in which they may testify."  Nichols v. Astrue, No. 10-cv-11641-DPW, 2012 WL 474145, at *12–13 (D. Mass. Feb. 13, 2012) (alteration in original) (quoting Farrin v. Barnhart, 2006 WL 549376, at *4 (D. Me. Mar. 6, 2006)).

Reflecting this inevitability, courts have found that a VE's estimate of job numbers corresponding to a particular claimant's limitations constitutes substantial evidence when based on the VE's professional experience.  See, e.g., Sunshine v. Berryhill, No. 16-CV-446-LM, 2018 WL 582576, at *7-8 (D.N.H. Jan. 29, 2018) (affirming where the ALJ relied on VE testimony that the claimant's impairment would reduce by one-quarter the number of available jobs and noting that the DOT does not account for such reductions); Sinclair v. Berryhill, 266 F. Supp. 3d 545, 559 (D. Mass. 2017) (finding the VE's adjustment to exclude inappropriate jobs, based on the VE's "thirty years of extensive experience," sufficient to meet the claimant's challenge to job

numbers); <u>Webster v. Colvin</u>, No. 1:14-CV-00213-JCN, 2015 WL 1186375, at *4 & n.6 (D. Me. Mar. 16, 2015) (relying on VE testimony "that based on her experience and observations in the field, she would not reduce the number of available jobs . . . because the occupations will accommodate" the claimant's limitation); <u>Nichols</u>, 2012 WL 474145, at *12 (affirming where the VE "initially reduced the number of jobs from the national census groups by a percentage she estimated from her twenty years of experience would accurately reflect the reduction in jobs available" to someone with the claimant's limitations); <u>see also</u> <u>Clark v. Astrue</u>, Civ. No. 09-390-P-H, 2010 WL 2924237, at *3 (D. Me. July 19, 2010) (finding that the VE's jobs estimate was not "substantial evidence" because the VE relied on raw published data and failed to adjust those numbers based on his experience and expertise). <u>But see, e.g.</u>, <u>Gross v. Colvin</u>, 213 F. Supp. 3d 229, 234–35 (D. Mass. 2016) (remanding where, "[w]hile the vocation expert stated that his testimony was based on his education, experience and training, he did not provide a specific calculus for how he estimated the jobs available when considering [the claimant's] specific exertional limits.").

I also note that Gonzalez's attorney did not cross-examine the VE about the reasons for the one-third reduction.  In light of the case law, discussed above, recognizing that a VE may (and often must) estimate job numbers in order to exclude inappropriate jobs, the failure to explore on cross-examination the VE's reduction here militates against remand on this point.  <u>Cf.</u> <u>Gay v. Sullivan</u>, 986 F.2d 1336, 1339–40 (10th Cir. 1993) (citations omitted) ("Counsel could have probed the [VE] about the source's reliability and acceptance in the profession, but he did not do so, and now our assessment of such matters is effectively foreclosed.  Furthermore, nothing prevented counsel from challenging the expert's figures and conclusions with data

available from other, administratively noticed publications, which is a recognized means of discrediting expert vocational testimony.").

However, even assuming arguendo that Gonzalez's impairments rendered him incapable of performing any ticket taker or usher jobs whatsoever, the ALJ nevertheless found that Gonzalez remains capable of working as a surveillance system monitor—a job that exists in significant numbers across the United States. Rushing v. Astrue, 360 F. App'x 781, 783 (9th Cir. 2009) (collecting cases) ("We . . . hold that surveillance-system monitor jobs exist in significant numbers in the national economy."). I reiterate that the 96,260 national and 1,650 Massachusetts surveillance system monitor positions referenced at Gonzalez's first hearing encompass only government jobs; the VE testified that Gonzalez also could find work as a surveillance system monitor in the private sector. Tr. 101. Even standing alone, 1,650 jobs is a "significant number." See, e.g., Aho v. Comm'r of Soc. Sec. Admin., No. 10–40052–FDS, 2011 WL 3511518, at *8 (D. Mass. Aug. 10, 2011) (citing Craigie v. Bowen, 835 F.2d 56, 58 (3d Cir. 1987) (finding 200 regional jobs significant); Allen v. Bowen, 816 F.2d 600, 602 (11th Cir. 1987) (same for 174 local jobs); Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (same for 110 regional jobs)) ("Courts have found that fewer than 200 jobs can satisfy the 'significant numbers' requirement. It would appear that 100 jobs is sufficient to meet the statutory threshold."). In light of the significant number of surveillance system monitor jobs that the ALJ properly determined Gonzalez can perform, even if I found error regarding the number of available usher and ticket taker jobs, any such error would be harmless. See, e.g., id.; Perez Torres, 890 F.2d at 1255.

36

2.      Cross-Examination

Finally, Gonzalez protests that the ALJ who presided over his hearings impermissibly cut off his efforts to cross-examine the VE.  See Docket #18 at 20-22.  A social security claimant's right to conduct cross-examination has constitutional and regulatory components. Constitutionally, the Fifth Amendment's Due Process Clause guarantees claimants an "opportunity to be heard, . . . an opportunity to confront and cross-examine adverse witnesses," and a right to a hearing that is not "inadequate or manifestly unfair."  Silva v. Berryhill, 263 F. Supp. 3d 342, 347 (D. Mass. 2017) (first quoting Goldberg v. Kelly, 397 U.S. 254, 267 (1970); then quoting Goldberg, 397 U.S. at 269; and then quoting Interstate Commerce Comm'n v. Louisville & N.R. Co., 227 U.S. 88, 91 (1913)).  This includes "a right to cross-examine vocational experts as a part of procedural due process."  Haddock v. Apfel, 196 F.3d 1084, 1090 (10th Cir. 1999) (citing Glass v. Shalala, 43 F.3d 1392, 1396 (10th Cir. 1994)).

Social Security regulations also afford claimants "the right to question witnesses to inquire fully into the matters at issue."  S.S.A. Office of Hrgs. & Appeals, Hearings, Appeals, and Litigation Law Manual ("HALLEX") § I-2-6-60 (S.S.A. Jan. 15, 2016), 1993 WL 751900. The regulations further instruct, "Generally, the ALJ will provide a claimant . . . broad latitude in questioning witnesses.  However, the ALJ is not required to permit testimony that is repetitive or cumulative, or allow questioning that has the effect of intimidating, harassing, or embarrassing the witness."  Id.

Gonzalez focuses on an exchange at the supplemental hearing, see Tr. 43-49, during which the ALJ prohibited Gonzalez's attorney from asking the VE about information contained in a resource called the Occupational Information Network, commonly known as the O*NET.[16]

---

[16] To the extent that Gonzalez seeks to argue more generally that the ALJ did not permit adequate cross-examination, I reject that argument.  ALJ Griswold convened a thirty-minute supplementary hearing for the sole

Compiled by the U.S. Department of Labor, the O*NET is a continually updated database "containing hundreds of standardized and occupation-specific descriptors on almost 1,000 occupations covering the entire U.S. economy."  O*NET Resource Ctr., About O*NET, https://www.onetcenter.org/overview.html (last visited Jan. 30, 2018); e.g., Cunningham v. Astrue, 360 F. App'x 606, 16 (6th Cir. 2010) ("[T]he Department of Labor replaced the DOT with the Occupational Information Network (O*NET), a database that is continually updated based on data collection efforts that began in 2001 . . . .").  The Commissioner may, but is not required to, take administrative notice of the O*NET.  20 C.F.R. § 404.1566(d)(1) (stating that the Commissioner "will take administrative notice of reliable job information available from various governmental and other publications" and listing five examples; see, e.g., Sinclair, 266 F. Supp. 3d at 559 (citing Donahue v. Barnhart, 279 F.3d 441, 445 (7th Cir. 2002)) (explaining that the five listed examples, which do not include the O*NET, are "neither exhaustive nor exclusive").

Even though regulations do not require ALJs to consider the O*NET, several Courts of Appeals have expressed that ALJs ought to do so.  See, e.g., Dimmett v. Colvin, 816 F.3d 486, 489 (7th Cir. 2016) ("Compounding the weakness [of the VE's testimony], both the administrative law judge, in uncritically accepting the vocational expert's testimony, and the vocational expert . . . appear to have ignored the most current manual of job descriptions—the O*NET."); Alaura v. Colvin, 797 F.3d 503, 507 (7th Cir. 2015) ("[T]he DOT has been superseded by the O*NET . . .—a fact ignored by the Social Security Administration's vocational experts and administrative law judges."); Cunningham v. Astrue, 360 F. App'x 606, 616 (6th Cir. 2010) ("[W]e conclude that the VE's dependence on the DOT listings alone does

---

purpose of permitting Gonzalez to cross-examine the VE.  See Tr. 38.  Gonzalez's attorney made use of that opportunity, which I find satisfies the Due Process Clause and the Social Security Administration's regulations.

not warrant a presumption of reliability" because "more current job descriptions were available [on the O*NET] at the time of the hearing . . . ."); see also Lee v. Barnhart, 63 F. App'x 291, 293 (9th Cir. 2003) ("SSR-004p does not preclude reliance on the O*NET; it merely provides that when there is a conflict between the DOT and another source, and the ALJ relies on the other source, the ALJ must explain his reasons for doing so.").

While the First Circuit does not appear to have addressed this issue, a recent opinion from this District dismissed as "nonsensical" the Commissioner's argument that the O*NET is unreliable, and it collected cases that were remanded because "more current job descriptions raise[d] doubts about the vocational expert's . . . reliance on the Dictionary [of Occupational Titles]." See Sinclair, 266 F. Supp. 3d at 558-60 (citations omitted) ("If O*NET is reliable enough for the author of the Dictionary, the Department of Labor, to use, it seems nonsensical that O*NET is unreliable for the Administration's purposes. Other courts have determined that until the Administration publishes an updated job classification manual, O*NET job descriptions are useful.").

This case law emphasizing the O*NET's usefulness to VEs and ALJs thus calls into question the ALJ's statements that the O*NET is "not relevant" and that "[t]he Agency does not rely on the O*NET." Tr. 49. The same goes for the VE's dismissals of the O*NET as unscientific. Tr. 43-44, 112 ("[T]he problem with the O*NET is it doesn't matter because it's— the O*NET is not considered science because of [the] way it was put together."). These remarks appear to be out of step with the developing case law addressing the O*NET's proper application in the Social Security context.

Nonetheless, I discern no reversible error in the ALJ's decision to cut off Gonzalez's attempts to question the VE about the O*NET in this case. While a handful of Circuit Court

opinions have suggested that an ALJ's failure to consider O*NET information can necessitate remand, Gonzalez has not offered, and the Court's research has not revealed, any binding authority obliging the ALJ to consider testimony about the O*NET.  Further, I believe the Ninth Circuit's language in Lee v. Barnhart best interprets the relevant regulation: SSR 00-4p neither precludes nor requires reliance on the O*NET but rather "merely provides that when there is a conflict between the DOT and another source, and the ALJ relies on the other source, the ALJ must explain his reasons for doing so."  Lee, 63 F. App'x at 291; see SSR 00-4p, 2000 WL 1898704, at *2.

Finally, I note that the O*NET listing about which Gonzalez's attorney appears to have wanted to question the VE—O*NET Code 33-9031.00, see Tr. 45 (referencing code number "33-9031")—does not appear to correspond with the surveillance system monitor job listed in the DOT and discussed by the VE.  Rather, that O*NET entry describes "Gaming Surveillance Officers and Gaming Investigators."  O*NET Resource Ctr., Details Report for: 33-9031.00 – Gaming Surveillance Officers and Gaming Investigators (2016), https://www.onetonline.org/link/details/33-9031.00 (last visited Jan. 30, 2018).  Among other things, that job includes tasks associated with compliance officers, surveillance supervisors, and surveillance technicians.  See id. (listing a "[s]ample of reported job titles").  The job also requires the ability to engage in "[w]ritten [e]xpression" and involves typing and writing.  See id.

Those requirements contrast with the VE's description of a surveillance system monitor.  According to the VE, the job "can be something as basic as somebody who works in a condominium complex and watches a few TV monitors for entrance and exits and lets people in and out of a building after hours."  Tr. 101 (further describing surveillance system monitor as a "sedentary, unskilled job" with "little of any [sic] reaching and handling").  The VE offered this

description based on his "professional experience with placing individuals in similar occupations with similar limitations," Tr. 103, affording the ALJ sufficient justification to rely on this testimony, see SSR 00-4p, 2000 WL 1898704, at *2 ("Information about a particular job's requirements . . . may be available . . . from a VE's . . . experience in job placement or career counseling."). Considering the disparities between the VE's description of a surveillance system monitor and the "Gaming Surveillance Officers and Gaming Investigators" entry in the O*NET, I further find that any error potentially committed by the ALJ respecting Gonzalez's attempted questions about the O*NET was harmless. See, e.g., Perez Torres, 890 F.2d at 1255.

IV.   CONCLUSION

Finding that Gonzalez's arguments for remand lack merit, I RECOMMEND that the Court DENY Gonzalez's Motion to Remand, Docket #17, and ALLOW Defendant's Motion for Order Affirming the Decision of the Commissioner, Docket #22.[17]

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[17] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file specific written objections to them with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. See Fed. R. Civ. P. 72. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which any objection is made as well as the basis for any such objection. The United States Court of Appeals for the First Circuit repeatedly has indicated that failure to comply with this rule will preclude further appellate review of the District Court's order based on this Report and Recommendation. See, e.g., Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).